**FILED**

4:17 pm, 6/24/20

**Margaret Botkins
Clerk of Court**

Jack D. Edwards, 6-3877
Kaden B. Canfield, 7-6238
EDWARDS LAW OFFICE, P.C.
PO Box 5345
Etna, WY 83118
Ph.: (307) 883-2222
Fax: (307) 883-0555
jack@edwardslawofficepc.com
kaden@edwardslawofficepc.com
*Of Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| JANE DOE, a minor, by and through her mother and Next Friend, JACKIE DOE, | ) ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | **COMPLAINT** |
| (1) BOARD OF TRUSTEES OF THE TETON COUNTY SCHOOL DISTRICT NO. 1; (2) GILLIAN CHAPMAN, Superintendent in her individual capacity; (3) SCOTT CRISP, in his individual capacity; and (4) DANIEL ABRAHAM, in his individual capacity, | ) ) ) ) ) ) ) ) ) ) | Case No.   20-CV-110-S **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

Plaintiff, JANE DOE, by her mother and next friend, JACKIE DOE, and by and through

her counsel, brings this action against Defendants Teton County School District No. 1 ("TCSD"),

Gillian Chapman, Scott Crisp, and Daniel Abraham for Defendants' violations of her rights under

Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.*, and

1

violations of her rights to equal protection of the laws under the Fourteenth Amendment to the U.S. Constitution and federal rights under Title IX, pursuant to 42 U.S.C. § 1983.

## INTRODUCTION

1.

This case is a civil rights case brought by Plaintiff, a former TCSD student, who while attending TCSD schools was subjected to severe student-against-student harassment and retaliation after reporting to TCSD officials that a TCSD student sexually assaulted her. After receiving Plaintiff's initial report of sexual assault and reports of subsequent harassment and retaliation by TCSD students, TCSD officials with authority to stop the harassment and retaliation disregarded her reports, acted with deliberate indifference to the assault and sexual harassment. Specifically, TCSD failed to remedy the hostile educational environment, punished Plaintiff, and ultimately removed Plaintiff from their schools, all in violation of TCSD's Title IX obligations.

2.

Additionally, TCSD, by and through CHAPMAN, CRISP, and ABRAHAM implemented and executed policies and customs in regard to, and in response to, Plaintiff's report that she had been sexually assaulted by another TCSD student, in violation of Plaintiff's Fourteenth Amendment Constitutional rights.

3.

Finally, TCSD, CHAPMAN, CRISP, and ABRAHAM were policy makers and administrators having duties to train, and failed to train, and failed to properly or sufficiently train its administrators, staff, students, and parents about: sex discrimination and sexual harassment against students; Title IX and/or student-against-student sexual misconduct; identifying, investigating, reporting, and remedying the effects of sexual harassment by students against

students like Plaintiff; or properly responding to and remediating continued harassment and hostility by students like those who continued to harass Plaintiff after she reported sexual assault.

4.

Plaintiff seeks recovery to redress the hostile educational environment and civil rights violations she suffered by Defendants actions and inactions, pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and 42 U.S.C. § 1983.

**PARTIES, JURISDICTION AND VENUE**

5.

JANE DOE is a seventeen-year old female, and a citizen of the United States, residing in Alpine, Lincoln County, Wyoming. "Jane Doe" has been substituted for Plaintiff's name in order to protect her privacy as an individual and minor who has been sexually assaulted.

6.

TCSD is a body corporate legally organized in the state of Wyoming.

7.

The TCSD BOARD is the governing body for the affairs of TCSD, with the power to sue and be sued on behalf of TCSD.

8.

TCSD operates as a public-school district serving students in Jackson, Wyoming and surrounding rural communities, such as DOE. TCSD has fewer than 3,000 students in grades K-12. Jackson Hole High School ("JHHS"), TCSD's flagship high school, has a student population of less than 700 students for grades 9-12. In 2020, U.S. News and World Report ranked JHHS as the best high school in Wyoming, a status JHHS has held for six of the past eight years. During all material times, TCSD received federal funding for its academic programs and activities.

9.

Defendant GILLIAN CHAPMAN ("CHAPMAN"), sued in her individual capacity, was at all relevant times the Superintendent of TCSD.  At all relevant times, CHAPMAN was an agent and/or employee of TCSD, acting within the scope of her employment.

10.

Defendant SCOTT CRISP ("CRISP"), sued in his individual capacity, was at all relevant times the Principal of JHHS.  At all relevant times, CRISP was an agent and/or employee of TCSD, acting within the scope and course of his employment.

11.

Defendant DANIEL ABRAHAM ("ABRAHAM"), sued in his individual capacity, was at all relevant times the Vice Principal of JHHS.  At all relevant times, ABRAHAM was an agent and/or employee of TCSD, acting within the scope and course of his employment.

12.

Defendants TCSD, CHAPMAN, CRISP, and ABRAHAM, were administrators and final policymakers, responsible for articulating, training, and ensuring compliance with federal law, state law, and official and unofficial policies for the protection of TCSD's students at JHHS.

13.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  As the events in question occurred in Teton and Lincoln Counties, Wyoming, venue is proper in this Court.

**FACTUAL BACKGROUND**

6.

In the 2017-2018, 2018-2019 and 2019-2020 school years, TCSD received federal funding, as contemplated by Title IX, 20 U.S.C. § 1681 *et seq.*, for its activities.

7.

TCSD is responsible for all facets of school operations and programs in the district, including the staffing and training of key positions (such as a administrators and Title IX Coordinators) and the provision of security for its students.  To that end, it maintains policies and customs regarding discrimination, student harassment, the reporting and prompt investigation of discrimination and sexual harassment complaints, and disciplinary action.

8.

TCSD is responsible for ensuring that its employees are properly trained and supervised to perform their jobs.  This includes CHAPMAN's performance of the job of TCSD Superintendent, CRISP's performance of the job of JHHS Principal, and ABRAHAM's performance of the job of JHHS Assistant Principal, whose responsibilities include the receiving of verbal and written reports of sexual assault and harassment and the investigation of these reports, as well as the institution of corrective measures on behalf of TCSD, such as disciplining students.

9.

TCSD is responsible for the acts and omissions of its employees (to include CRISP, CHAPMAN, and ABRAHAM) and agents.

10.

TCSD, acting through CRISP, CHAPMAN, and ABRAHAM, is responsible for enforcing its policies and procedures regarding student discipline, to include policies and procedures prohibiting and remedying sexual assault and harassment.

11.

From August 2014 through October 2019, Plaintiff was a student enrolled in TCSD schools. When she reached high school she participated in choir, band, Model United Nations, and the school hockey team at JHHS.  Plaintiff was well-liked by her teachers.

12.

During the summer of 2017, when Plaintiff was 14 years old, she was forcibly held down and vaginally raped by a peer TCSD student, J.H.

13.

After the assault, J.H. sent Snapchat messages to Plaintiff expressing regret for his actions.

14.

Plaintiff's entire countenance and personality changed after being raped.  Specifically, she was afraid to tell anyone what had happened, and she held her feelings and her story inside hoping everything would just go away.  She felt hurt, scared, hollow, and angry.  Her family noticed the difference in behavior, but the cause for the changes was a mystery to them.

15.

When the 2017-2018 school year started everything did not simply go away.  Plaintiff was a freshman at JHHS.  J.H. was Plaintiff's peer at JHHS.  Plaintiff and J.H. shared the hallways, classes, and extracurricular activities.  Before he sexually assaulted Plaintiff, J.H. had befriended Plaintiff and she trusted him.  They also had many friends and acquaintances in common.  Due to

the small size and small student population of JHHS, Plaintiff was unable to avoid J.H. and his friends in classes, in common areas, and at school activities.

16.

Following the rape, simply being forced to be around J.H. in school caused Plaintiff to suffer panic attacks and to face daily reminders of fear, pain, shame, secrecy, and anger. Besides being very large and strong for his age, J.H. is a very smart and popular student. He is a champion debater and speaker who also participated in school choir and Model United Nations at JHHS. His aspirations include attending law school and entering politics. His hope is to achieve election as a United States Senator. From her experience, Plaintiff also believed J.H. was a sexual predator.

17.

As the year went on Plaintiff's depression and panic attacks worsened in frequency and severity. She suffered frequent suicidal ideations. She began cutting herself as a coping mechanism.

18.

Plaintiff sought counseling external to JHHS in October of 2017 after her friends expressed concerns to a JHHS school counselor that Plaintiff was depressed and wanted to hurt herself.

19.

In the Fall of 2017, JACKIE DOE ("Mrs. DOE"), reported to JHHS counselor Emily Hoffer ("Ms. Hoffer") that S.H., a boy Plaintiff dated just prior to being raped that summer, was publicly and privately verbally harassing Plaintiff. Much of the harassment was sexual in nature or due to Plaintiff's female sex. The harassment was bold, severe, and unchecked. On one occasion, Plaintiff was forced to leave a JHHS sports team practice because S.H. was talking about Plaintiff so loudly that Plaintiff could overhear his insults from inside the girls' locker room. Additionally,

Mrs. DOE communicated to Ms. Hoffer that the text messages and social medical contact between the boy and Plaintiff showed the boy's clear intent of encouraging Plaintiff to kill herself. Upon information and belief, JHHS administration performed no investigation and took little or no action to remedy this situation.

20.

As a result of the emotional stress from being raped and being forced to be around her rapist daily in school, Plaintiff started missing school and fell behind in her schoolwork.

21.

In February of 2018 Plaintiff spent time in inpatient crisis facility for self-harm behavior.

22.

In March of 2018 Plaintiff reported to her therapist that a traumatic incident from the past summer could have a role in her depression, but at that time she was unable to discuss any details.

23.

Also in March of 2018, Mrs. DOE notified Ms. Hoffer that Plaintiff's JHHS classmates were bullying Plaintiff about cutting and encouraging Plaintiff to kill herself.

24.

Upon information and belief, Ms. Hoffer informed Dean of Students, Sarah Tenney ("Dean Tenney") about Mrs. Doe's report that Plaintiff's classmates were bullying Plaintiff. Dean Tenney told Ms. Hoffer that she would discuss the matter with the offending students' parents. Dean Tenney did not inform Plaintiff or Mrs. DOE whether any eventual action was taken by JHHS administration to remedy the situation.

25.

Through the end of the 2017-2018 and the following school year Plaintiff continued to struggle both academically and socially. Plaintiff either suffered in silence around J.H in classes and school activities or isolated herself when she could no longer force herself to be around him. In desperation and isolation, Plaintiff's school attendance suffered, and again she fell behind in her grades.

26.

On January 8, 2019, Plaintiff was placed by her parents in a youth inpatient crisis facility due to depressive type behavior, acting out, and self-harm actions.

27.

Through therapy Plaintiff was finally able to open up about the 2017 rape. Plaintiff told her therapist that she had been sexually assaulted by J.H. in the summer of 2017. Plaintiff gained the confidence to tell her parents about the rape. While in the crisis facility, Plaintiff was reportedly a model resident who was kind to both staff and peers as well as compliant of all rules and expectations.

### *Sexual Harassment and Retaliation of Plaintiff, and Defendants' Inadequate Response*

28.

As of January 8, 2019, it is believed that TCSD and JHHS administration were without knowledge that J.H had raped Plaintiff in 2017.

29.

Because J.H. participated in extracurricular school activities that included overnight co-ed trips, Plaintiff felt JHHS administration needed to know about J.H.'s actions and propensities in

order to protect her and other students.  With the courage gained in counseling and with the support

of her therapist, Plaintiff decided to report to JHHS that J.H. had sexually assaulted her.

30.

Plaintiff's therapist, Matia Wilson agreed to facilitate a meeting with JHHS administration.

31.

On January 17, 2019 Plaintiff and her therapist, Matia Wilson, met with JHHS school

counselor Emily Hoffer.  At that meeting, Ms. Hoffer was informed that Plaintiff was currently in

an inpatient youth crisis facility, and that Plaintiff had been sexually assaulted by her JHHS peer,

J.H., in 2017.   Ms. Hoffer also learned that Plaintiff had struggled behaviorally, socially,

physically, and scholastically over the past year and a half due to the difficulty of coping with the

sexual assault on her own.

32.

In response to Plaintiff's report of being raped by her peer, Ms. Hoffer informed Plaintiff

that her classes could be changed so that Plaintiff did not have to be in the same classes with J.H.

The proposed changes would force Plaintiff from her favorite classes.   When Plaintiff requested

consideration to stay in a certain class she enjoyed, Ms. Hoffer stated that that other than

rearranging Plaintiff's classes and seeking leave for her to turn in assignments late, nothing else

could be done.

33.

At no point during the meeting with Ms. Hoffer and Ms. Wilson was Plaintiff informed by

Ms. Hoffer that Plaintiff had rights as a victim under Title IX, or that the school could open a Title

IX investigation, or that the school could take action against J.H., or that the school could do

anything to protect Plaintiff from subsequent harassment.

34.

Plaintiff was not informed by Ms. Hoffer that she could or should report the assault to a TCSD Title IX coordinator.

35.

Plaintiff trusted that Ms. Hoffer and TCSD would take appropriate actions to protect Plaintiff and other JHHS students in response to learning that Plaintiff had been raped by her peer.

36.

According to the policies contained in the 2018-2019 JHHS Student Handbook, JHHS all staff have authority to address minor disciplinary infractions.  Additionally, all JHHS staff are required to immediately notify a school administrator of any act of violence they have knowledge of, have witnessed or received.  All reports are to be promptly investigated.  The Student Handbook also provides that all reports of alleged harassment will be thoroughly investigated by JHHS administration.

37.

Also according to the policies contained in the 2018-2019 JHHS Student Handbook, the Dean of Students and other administrators such as the Principal and Vice Principal have authority to address major disciplinary infractions such as harassment, as well as repeated minor disciplinary infractions.

38.

The rights of victims of sexual harassment or assault are not mentioned in the 2018-2019 JHHS Student Handbook.

39.

Students' rights under Title IX are not referenced in the 2018-2019 JHHS Student Handbook.

40.

The name and/or contact information for TCSD's Title IX Coordinator or JHHS's Title IX Coordinator is not provided in the 2018-2019 JHHS Student Handbook.

41.

Upon information and belief, Ms. Hoffer promptly informed ABRAHAM and other JHHS administrators of Plaintiff's report that Plaintiff had been raped by another JHHS student.

42.

While Ms. Hoffer was untrained and inexperienced in handling Title IX matters, ABRAHAM and the other JHHS administrators knowingly and willfully permitted Ms. Hoffer to oversee Plaintiff's report that she had been raped and to otherwise assist Plaintiff.

43.

On January 23, 2019, Plaintiff's therapist, Ms. Wilson, reported the sexual assault to Deputy Roundy, the JHHS School Resource Officer. Although Ms. Hoffer and ABRAHAM had mandatory reporting duties under W.S. § 14-3-201, et seq., they had not yet reported Plaintiff's sexual assault to law enforcement.

44.

The Teton County Sheriff's Office promptly scheduled a forensic interview of Plaintiff, which was conducted on January 24, 2019.

45.

Upon learning that the sexual assault by J.H. took place within the jurisdictional boundaries of the Town of Jackson, the Teton County Sheriff's Office turned the case over to the Jackson Police Department ("Jackson PD").

46.

J.H. was contacted by Jackson PD and asked to sit for an interview.

47.

On January 29, 2019, Plaintiff was discharged from the inpatient crisis facility with recommendations from the crisis facility that she maintain lines of communication with JHHS to ensure she felt safe at school.

48.

J.H. agreed to be interviewed by a Jackson Police Department officer on February 13, 2019 with the stipulation that his lawyer be present and the interview not be recorded.

49.

At the beginning of J.H.'s interview, the officer informed J.H. that a female juvenile alleged that J.H. had sexually assaulted her. Without disclosing to J.H. the identity of his accuser, J.H. immediately began describing to the officer his relationship and sexual interactions with Plaintiff. J.H. stated that Plaintiff initiated all sexual contact between them and that when Plaintiff told him "no," he stopped. J.H. further alleged that Plaintiff made up the assault accusation because J.H. lost interest in the relationship and he would not give Plaintiff attention.

50.

In March of 2019, the Jackson Police Department completed its investigation and forwarded the case to the Teton County Attorney's Office.

51.

After learning that Plaintiff reported the sexual assault to TCSD and law enforcement, J.H. and his friends began to sexually harass Plaintiff by taunting her and spreading sexualized rumors about her. They also retaliated against Plaintiff for reporting their friend J.H. for sexual assault by falsely accusing Plaintiff of various school disciplinary infractions, including making threats of violence, that she had not committed.

52.

Instead of investigating the conduct of J.H. and his friends targeting Plaintiff for harassment and false accusations, JHHS administration investigated and disciplined Plaintiff. The reports made by J.H. and his friends against Plaintiff were false, missing important factual context, or both. This was a sustained campaign of retaliation against Plaintiff for reporting that J.H. had sexually assaulted her.

53.

On April 11, 2019, J.H. had reported to the Teton County Sheriff's Office that a friend texted him stating that a female who was going to accuse him of sexual assault (Plaintiff) was at J.H.'s house and was attempting to break a window. This report was investigated by the Sheriff's Office. No one involved in the report actually saw Plaintiff at J.H.'s residence or knew her whereabouts. In fact, Plaintiff was never at J.H.'s residence and was instead in another town.

54.

On April 18, 2019, Plaintiff contacted Deputy Roundy, the JHHS School Resource Officer, to inquire about the status of the criminal investigation of J.H.'s sexual assault. Deputy Roundy informed Plaintiff that he was no longer involved in the case or investigation. He informed Plaintiff that he would ask those involved in the investigation (Jackson PD) to keep her informed.

55.

Since learning of the rape, TCSD and JHHS administration had failed to take action to remedy the impact on Plaintiff of having been sexually assaulted by a classmate whom she was continuing to encounter regularly at school.

56.

Overtaken with frustration and anger, Plaintiff snuck into the band room and cut the laces of J.H.'s choir shoes. T.D., one of J.H.'s friends who witnessed the event, informed ABRAHAM and Deputy Roundy of Plaintiff's actions. The report was promptly investigated by ABRAHAM. When asked, Plaintiff admitted that she cut J.H.'s laces because she was mad at J.H. because he had raped her. ABRAHAM and Deputy Roundy determined that the incident could be handled within the school. They asked Plaintiff to replace J.H.'s choir shoelaces (and Plaintiff agreed to do so); ABRAHAM did nothing regarding Plaintiff's report that J.H. had sexually assaulted her.

57.

JACKIE DOE ("Mrs. DOE"), Plaintiff's mother, obtained a copy of TCSD's policies on sexual harassment and on the investigation of sexual harassment. Copies of these policies are attached as Exhibits A and B, respectively. The policies state that TCSD's policies on sexual harassment apply to events that occur on and off TCSD property and that "[TCSD] shall act to investigate all complaints, either formal or informal, verbal or written, of sexual harassment and to discipline any student or employee who sexually harasses a student or employee of [TCSD]". Additionally, the policies provide that that both the "Administrator" and "the administrator or Superintendent" shall promptly and thoroughly investigate all complaints of sexual harassment, including anonymous complaints. It further provided that interviews will be conducted, that evidence be preserved, and that detailed and accurate records will be kept. Finally, the policy

15

states that the complainant will be informed of the progress, conclusions, and proposed corrective actions resulting from the investigation.

58.

Mrs. DOE also searched TCSD's staff registry to find out who was TCSD's Title IX Coordinator. On the TCSD and JHHS websites she could not find anyone listed with a Title IX position or any information about who the Title IX Coordinator was.

59.

In an internet search, Mrs. Doe located a Title IX coordinator registry maintained by the U.S. Department of Education. The registry reported Michele Doyle as TCSD's Title IX Coordinator. The registry also provided Ms. Doyle's contact information.

60.

Mrs. DOE attempted to contact Ms. Doyle and learned that Ms. Doyle was no longer employed with TCSD.

61.

On May 2, 2019, Mrs. DOE requested a meeting with CRISP, ABRAHAM, and Dean of Students Sarah Tenney (the "Administrators"). Mrs. DOE requested the meeting to inquire about what had been done and what more could be done regarding her daughter's rights as a victim of sexual assault. She wanted to know the name of TCSD's Title IX Coordinator. She wanted to know who at TCSD was assigned to perform TCSD's Title IX investigation into Plaintiff's sexual assault by J.H. and the ongoing harassment and retaliation following the rape. She also wanted to help TCSD make the school safe for her daughter.

62.

On May 3, 2019 Mrs. DOE attended the meeting with the Administrators.

16

63.

Mrs. DOE brought to the May 3rd meeting printed information relating to victims' rights under Title IX. At the meeting, Mrs. DOE inquired who had been assigned to investigate Plaintiff's sexual assault and ongoing harassment under Title IX. She inquired into what had been done and what more could be done regarding Plaintiff's Title IX rights as a victim of sexual assault. The Administrators informed Mrs. DOE that they were unfamiliar with Title IX or how it applied to the situation. They told Mrs. DOE that no investigation had been performed into J.H.'s rape of Plaintiff. Mrs. DOE asked who the Title IX Coordinator was for TCSD. Mrs. DOE was told that they did not know who TCSD's Title IX coordinator was or if it had one. Furthermore, CRISP was aloof during the meeting and showed no interest or concern that Plaintiff had been sexually assaulted by another JHHS student.

64.

Up to this point, Plaintiff and Mrs. DOE trusted that TCSD was trying to help Plaintiff.

65.

Instead of focusing on assisting Plaintiff with her rights to equal access to educational opportunity at JHHS, the Administrators revealed their betrayal of Plaintiff and suggested in the meeting that Plaintiff was the problem, not J.H. or his friends.

66.

Mrs. DOE left the meeting deflated and shocked by the TCSD's and the Administrators' complete lack of response or concern that one of their own students had sexually assaulted another JHHS student.

67.

Since learning about the rape in January of 2019, JHHS administration and TCSD failed to perform an investigation or even appoint an investigator. Additionally, TCSD had taken no actions to eliminate the hostile environment Plaintiff had been subjected to since Fall of 2017. Finally, TCSD failed to act in response to learning that Plaintiff was exposed to ongoing harassment and retaliation after speaking up about her rape.

68.

ABRAHAM later contacted Mrs. DOE to ask Plaintiff to come to school and complete standardized testing. Mrs. DOE informed ABRAHAM, TENNEY and Emily Hoffer that Plaintiff did not feel safe at JHHS, and that Plaintiff's fear was compounded by bullying and rumors surrounding Plaintiff's absence. ABRAHAM and Emily Hoffer offered to meet with Plaintiff and Mrs. DOE on May 15, 2019 to discuss how Plaintiff could avoid falling further behind academically.

69.

On May 15, 2019, Plaintiff and Mrs. DOE met with Emily Hoffer, and ABRAHAM. Instead of discussing Plaintiff's academic needs, ABRAHAM again began subtly and impliedly blaming Plaintiff for causing problems by reporting that J.H. had assaulted her. ABRAHAM then presented Plaintiff with a no contact order and forced Plaintiff to sign the order before Plaintiff was to be permitted to return to JHHS. ABRAHAM also restricted Plaintiff's access to certain areas of the school. Mrs. DOE asked ABRAHAM whether J.H. was required to sign a similar order. ABRAHAM initially told her no. When Mrs. DOE protested, ABRAHAM agreed that he would have J.H. sign a similar no-contact order. Plaintiff was never informed whether J.H. signed a no contact order.

70.

The Administrators were made aware that Plaintiff still did not feel safe to return to school.

71.

Plaintiff was working on makeup school assignments from home.  On May 23, 2019, Plaintiff informed one of her teachers that she felt like giving up.  This correspondence was known to TCSD and placed into JHHS's official student file on Plaintiff.

72.

Plaintiff tried to return to school.  Promptly upon return, the harassment by J.H. and his friends resumed.  On one occasion, on June 10, 2019, J.H. aggressively approached Plaintiff and told her that she should 'kill herself.'  Mrs. DOE emailed ABRRAHAM to tell him about the incident and remind ABRAHAM that Plaintiff was having a difficult time feeling safe at JHHS with J.H.'s ongoing harassment.  ABRAHAM's reply was that he was aware of the situation.  The school year ended, and Plaintiff and her family hoped for a fresh beginning with the next school year.

73.

Despite having actual knowledge that J.H. was under criminal investigation for raping Plaintiff, TCSD allowed J.H. to continue attending classes, visiting the cafeteria, visiting the library, visiting the halls and common areas, participating in student activities and otherwise roaming the campus, all the while harassing Plaintiff, spreading rumors, and retaliating against her for reporting the rape.

74.

Despite having actual knowledge that J.H. and his friends were harassing and retaliating against Plaintiff for reporting that J.H. raped Plaintiff, and that the harassment and retaliation

19

caused Plaintiff to feel unsafe at school, TCSD allowed J.H. to continue attending classes, visiting the cafeteria, visiting the library, visiting the halls and common areas, participating in student activities and otherwise roaming the campus.

75.

As a result, Plaintiff had to choose between going to classes, visiting the library, visiting the student common areas, participating in student activities and otherwise traveling around campus and thereby risking an encounter with J.H. in any of those areas, versus avoiding all public areas of campus in order to avoid J.H.  Many days she chose the latter and as a result missed many days of school.

76.

Defendants offered Plaintiff limited or no assistance to help her cope with being a victim of sexual violence by a student she was forced to be around daily at JHHS.

77.

Ms. Hoffer offered to help Plaintiff work with her teachers in excusing some of her missed schoolwork.  However, this is where TCSD's assistance ended.  Plaintiff continued to regularly miss school because when she went to school she had to face the threat that she would encounter her rapist and be subjected to harassment by him and his friends.

78.

Plaintiff and Mrs. DOE expressed to ABRAHAM and other Administrators their concerns and disappointment with Defendants' failure to investigate the sexual assault, subsequent harassment, or take action to prevent future harassment.

79.

The 2019-2020 school year began much like the past.  This year J.H. no longer attended JHHS classes, but he participated in JHHS extracurricular activities.  Plaintiff had no idea why J.H. was enrolled in a local private school for his coursework.  However, T.D. and other friends of J.H. blamed Plaintiff for this change.  Their harassment of Plaintiff continued.

80.

On September 17, 2019, T.D. reported to ABRAHAM and Deputy Roundy that Plaintiff had bumped into him at school and was making comments about him and glaring at him.  T.D.'s story later evolved into Plaintiff allegedly shoving T.D. into lockers and telling him "I'll fucking kill you," as well as Plaintiff concurrently sending student messengers to tell T.D. that he better "watch your neck."  Presumably because of Plaintiff's small size and frail build, T.D. also reported that Plaintiff "knew people" that could hold him down if she wanted to hurt him.   T.D. reported that there were no actual witnesses of these events.

81.

ABRAHAM scheduled a meeting between Plaintiff, T.D. and their parents.  However, T.D.'s mother requested that the meeting not proceed.  T.D.'s mother repeatedly informed Deputy Roundy that she felt Plaintiff will be a shooter like the Marjory Stoneman Douglas High School shooting in Florida.

82.

During his investigation, Deputy Roundy contacted the alleged "watch your neck" messenger noted above.  The alleged messenger told Deputy Roundy that Plaintiff had no involvement in the "watch your neck" exchange.  In fact, the student said the exchange was said

as a joke and meant as a joke, that both the he and T.D. smiled during the exchange.  No actual physical threat existed or was believed to exist.

83.

Deputy Roundy also learned that Plaintiff avoided contact with T.D. and that T.D. actually had initiated a confrontation with her on the first day of school that year by intentionally and aggressively blocking Plaintiff's access to her bag in a band storage room.  He learned that Plaintiff responded by stating: "Get the fuck out of my way."  There was no physical contact.  However, T.D. promptly reported Plaintiff to the band teacher and that Plaintiff expressed remorse to her teacher for her poor choice of words.

84.

Deputy Roundy asked whether Plaintiff ever harassed T.D. or gave him dirty looks. Plaintiff stated that T.D. frequently stared at Plaintiff and that when he did, Plaintiff had given him dirty looks to get him to stop.  Plaintiff expressed that she had no desire to interact with T.D. and just wished he would leave her alone.  When asked for T.D.'s motivations, Plaintiff said T.D. was being malicious and wanted her to get kicked out of school.  Even though T.D. was harassing Plaintiff, she acknowledged to Deputy Roundy that they were once good friends and she did not wish him any ill will.  She just wanted to be left alone.

85.

Also, around this same time, an anonymous reporter called the school to report that Plaintiff was threatening T.D.'s life and that it was like "Parkland" waiting to happen.

86.

Upon reviewing the report, Deputy Roundy concluded that the report did not contain any actual threats or dangerous situations and that the report likely originated from T.D.  After a

22

thorough investigation, Deputy Roundy concluded that the accusations of Plaintiff's threats and harassment were unsubstantiated.

87.

If TCSD performed an investigation into T.D.'s allegations that Plaintiff threatened him, it did not inform Plaintiff of this and records of the investigation were not included in Plaintiff's school file. Nevertheless, ABRAHAM again determined that Plaintiff was the problem.

88.

On September 18, 2019 ABRAHAM requested a meeting with Mrs. DOE and Plaintiff. ABRAHAM asked Plaintiff about her recent interactions with T.D. Plaintiff explained how on the first day of school T.D. intentionally blocked Plaintiff from her backpack in the band room and that in response she told T.D. to 'get the fuck out of her way.' She explained that the band director had promptly addressed the encounter, and that she agreed the language was inappropriate and that it would not happen again. Plaintiff reported to ABRAHAM that all parties seemed to consider the issue resolved. Mrs. DOE then asked ABRAHAM why he had called the meeting when it seemed it was addressed by the band director. ABRAHAM explained that Plaintiff was an aggressor and that he was concerned that she posed a continued threat to T.D. Plaintiff was shocked by the accusation and emphatically denied that she was a threat or had any intentional contact with T.D. after the encounter on the first day of school. Mrs. DOE then raised her concern that T.D. was actively trying to engage with Plaintiff with the goal of getting her in trouble with school administration. ABRAHAM dismissed Mrs. DOE's concern and requested that Plaintiff stop threatening T.D. Plaintiff agreed. She left hurt and frustrated with ABRAHAM's response to the ongoing unsubstantiated rumors and harassment from the friends of her assailant.

89.

On September 19, 2019, Jeff Daugherty, TCSD Assistant Superintendent, showed up at Plaintiff's residence to perform a random a residency check on Plaintiff.

90.

Prior to moving to Alpine, Plaintiff and her parents maintained a residence in Jackson, Teton County, Wyoming.  Alpine is a commuter community near the border of Lincoln and Teton counties.  Alpine also is near equal distance to JHHS and Star Valley High School.  Star Valley High school is a rural school located in Afton, Lincoln County, Wyoming.  Because of the high cost of living in Jackson, the parents of many children attending Teton County schools have moved to Alpine but keep their children enrolled in TCSD schools.  TCSD schools have good academic ratings and are located in Jackson, where the parents work, instead of the nearly 70 miles distance to Star Valley High School.  Plaintiff's family fell under this tradition.  They used to live in Jackson, but as their family grew, they had to move to Alpine but kept their children enrolled in TCSD schools.  The fact that Plaintiff resided in Alpine was not concealed but was known to many members of JHHS and TCSD staff.  Up until this date, TCSD had never made Plaintiff's residence an issue.

91.

When Mrs. DOE questioned Mr. Daugherty about his visit, she learned that the so-called random residency check was not random at all.  Specifically, Mr. Daugherty informed Mrs. DOE that he had not performed a residency check on all the other families of TCSD students similarly situated as Plaintiff's family.  More specifically, many of Plaintiff's Alpine neighbors similarly had enrolled their students in TCSD schools but have not followed any formal process of applying

for out-of-county enrollment.  Mr. Daugherty informed Mrs. DOE that he was asked to perform the "random" residency check on Plaintiff.

92.

Upon information and belief, TCSD believed the other Alpine students' allegedly violating the TCSD's residency policy were not causing enough problems to warrant a random residency check.

93.

Upon learning that Plaintiff's address on file was outdated, Mr. Daugherty informed Plaintiff's parents by letter that Plaintiff and her brother were to be removed from TCSD schools unless proof of Teton County residency could be provided.

94.

By this act, Plaintiff was again being singled out and harassed for reporting that she was raped by a fellow student.  This time the harassment was not student harassment and retaliation enabled by TCSD inaction, but harassment and retaliation by official TCSD action under the guise of TCSD policy.  TCSD had had enough of dealing with Plaintiff and her rights.

95.

Mrs. DOE emailed the Administrators to inquire again about Plaintiff's victims' rights under Title IX.  ABRAHAM conveyed to Mrs. DOE by email that Title IX requests should be now be directed to a Charlotte Reynolds who worked at the TCSD office.  While the residency issue was a pretext, ABRAHAM made sure to cover his tracks and state to Mrs. DOE that Plaintiff and her brother were welcome in TCSD schools with an active Teton County lease.

96.

On September 27, 2019, ABRAHAM contacted Mrs. DOE to inform her that Plaintiff would be unable to return to school until ABRAHAM had conducted an interview regarding alleged threats that Plaintiff had made to other JHHS students.

97.

On September 30, 2019, Plaintiff's parents were sent a letter from Mr. Daugherty informing them that Plaintiff and her sibling had been removed from TCSD's rolls.

98.

No Title IX investigation was ever conducted regarding Plaintiff's reports of rape and ongoing sexual harassment by TCSD students.

99.

TCSD excused their failure to timely perform a Title IX investigation on Plaintiff's alleged failure to fill out a TCSD form.  Although TCSD and JHHS administration had actual knowledge that Plaintiff had been raped by another TCSD student and subjected to ongoing sexual harassment and retaliation, no form was ever provided to Plaintiff and she was never encouraged by any TCSD staff to fill out any forms.  In fact, Plaintiff, never knew such a form existed.

100.

Upon information and belief, TCSD enforced its policies to remove Plaintiff from their system when they perceived, without conducting any Title IX investigation, that Plaintiff as a female was to blame for her poor academic behavior and the ongoing issues with J.H. and his friends after being sexually harassed by J.H.  Nevertheless, TCSD failed to enforce its policies to protect Plaintiff's rights as a female victim of peer rape and sexual harassment.

101.

TCSD plan to remove Plaintiff from their school district was not the routine application of district policy, but intentional and retaliatory for Plaintiff reporting that she had been raped by another TCSD student and for seeking to enforce her Constitutional rights to equal access to education as a student of TCSD.

102.

TCSD escalated the hostile educational environment Plaintiff suffered when it failed to comply with its own policies in handling Plaintiff's reports of sexual harassment and retaliatory harassment.

103.

TCSD escalated the hostile educational environment Plaintiff suffered when it failed to appoint an independent investigator to promptly investigate Plaintiff's report of having been raped by another TCSD student.

104.

TCSD escalated the hostile educational environment Plaintiff suffered when it failed perform an investigation into Plaintiff's report of having been raped by another TCSD student.

105.

To the extent any TCSD staff actions could be deemed to be a Title IX investigation into Plaintiff's report of being sexually assaulted by a peer, TCSD escalated the hostile educational environment when the investigation was superficial and cursory and any conclusions unfounded.

106.

TCSD escalated the hostile educational environment Plaintiff suffered when it failed to provide Plaintiff adequate emotional and psychological support after its school administrators learned she had been raped by another TCSD student.

107.

TCSD escalated the hostile educational environment Plaintiff suffered when its school administrators allowed J.H. and his friends, unchecked and encouraged by no accountability, to harass and retaliate against Plaintiff for reporting that J.H. had raped her.

108.

TCSD escalated the hostile educational environment Plaintiff suffered when its school administrators allowed J.H.'s friends to use JHHS's student grievance process to harass Plaintiff by repeatedly alleging false and baseless accusations without penalty or even caution by administration.

109.

TCSD escalated the hostile educational environment Plaintiff suffered when its school administrators failed to inform J.H. that he was accused of sexual assault and ongoing retaliatory harassment that violated TCSD's policy and failed to instruct J.H. and his friends not to engage in that conduct or take reasonable action to remedy his ongoing harassment.

110.

TCSD escalated the hostile educational environment Plaintiff suffered when it punished Plaintiff by removing her from the classes she shared with J.H. instead of removing him from those classes.

111.

TCSD escalated the hostile educational environment Plaintiff suffered when, even though TCSD failed to perform a proper investigation, TCSD punished Plaintiff for reporting that she was sexually assaulted by J.H. by restricting her access to portions of JHHS campus and forcing Plaintiff to sign a no-contact order to protect her assailant.  By this action TCSD blamed Plaintiff as the victim instead of protecting her.

112.

To the extent that any TCSD efforts could be deemed to have been a Title IX investigation, TCSD escalated the hostile education environment Plaintiff suffered when it failed to document any investigation that took place and failed to keep Plaintiff apprised of its investigation or outcomes.

114.

As a result of TCSD's clearly unreasonable response to Plaintiff's report of being sexually assaulted and sexually harassed and retaliated against by students at JHHS, JHHS was not safe for Plaintiff and she was deprived of equal access to the educational opportunities at JHHS.

115.

TCSD's actions an inaction described herein discouraged its student who are victims of sexual harassment and assault, including Plaintiff, from speaking out against their assailants.

116.

As a direct result of the Defendants' conduct described herein, they created and/or subjected Plaintiff to a hostile educational environment that deprived her of access to educational opportunities at JHHS.

117.

Because of TCSD's actions and inactions, Plaintiff did not feel safe to return to JHHS. Plaintiff shared her fears with TCSD administrators, yet unreasonably ineffective action was taken to remedy the situation, in turn making Plaintiff liable and vulnerable to additional harassment and retaliation at JHHS.

118.

TCSD's Title IX program, if it existed beyond writing, did not assist Plaintiff.  Instead, when Plaintiff reported to TCSD that she had been raped by a TCSD student and asked for help, the very administrators that were charged with protecting Plaintiff instead betrayed, blamed, and re-victimized her.

119.

Additionally, as a direct result of the Defendants' conduct described herein, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, and psychological injuries.  Plaintiff was prevented and will continue to be prevented from performing her normal daily activities and obtaining the full enjoyment of life; and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

***Defendants Failed to Provide Essential Title IX and Sexual Harassment Training to Administrators, Staff, Students, and Students' Parents***

120.

A rape culture is prevalent in American high schools.  A rape culture is an environment in which rape is prevalent and in which sexual violence against women is normalized and excused.

Examples of rape culture include victim blaming, trivializing sexual assaults, tolerance of sexual harassment, and refusing to take rape accusations seriously, among others.

121.

In 1998, the U.S. Supreme Court stated, "[t]he number of reported cases involving sexual harassment of students in schools confirms that harassment unfortunately is an all too common aspect of the educational experience." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998).

122.

In 1999, the U.S. Supreme Court determined that schools may be held liable in private Title IX actions for monetary damages when they are deliberately indifferent to student-against-student sexual misconduct and harassment. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629 (1999).

123.

In January 2001, the U.S. Department of Education Office for Civil Rights ("OCR") issued *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* ("2001 OCR Guidance"), informing all U.S. schools receiving Federal financial assistance, including TCSD, that "[p]reventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn." OCR reminded schools that student-against-student sexual misconduct constitutes prohibited sexual harassment. OCR also stated:

> "[S]chools need to ensure that employees are **trained** so that those with authority to address harassment know how to respond appropriately, and other responsible employees know that they are obligated to report harassment to appropriate school officials. **Training for employees should include practical information about how to identify harassment and, as applicable, the person to whom it should be reported.**"

124.

The 2001 OCR Guidance stated, with respect to student-against-student sexual harassment:

> "If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and if the school knows . . . about the harassment, the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence. . . . [I]f, upon notice, the school fails to take prompt, effective action, the school's own inaction has permitted the student to be subjected to a hostile environment that denies or limits the student's ability to participate in or benefit from the school's program on the basis of sex."

125.

In January 2006, OCR issued *Dear Colleague Letter – Sexual Harassment Issues*, to U.S. public schools, including TCSD, stating, **"[u]nfortunately, a significant number of students are still subjected to sexual harassment, which can interfere with a student's education as well as his or her emotional and physical well-being."** OCR reminded public schools of their obligation "to take immediate and effective steps to end sexual harassment when it occurs, prevent its recurrence, and remedy its effects."

126.

On April 4, 2011, OCR sent *Dear Colleague Letter: Sexual Violence* ("2011 OCR Guidance"), to all U.S. public schools, including TCSD, that issued a **"call to action"** to the nation's schools because of "deeply troubling" data regarding school-place sexual violence. OCR informed schools, **"[d]uring the 2007-2008 school year, there were 800 reported incidents of rape and attempted rape and 3,800 reported incidents of other sexual batteries at public high schools."** The Guidance stated, "[a] number of different acts fall into the category of sexual violence, including rape, sexual assault, sexual battery, and sexual coercion. All such acts of sexual violence are forms of sexual harassment covered under Title IX."

127.

The 2011 OCR Guidance reminded schools they have an obligation to investigate reports of sexual harassment, must designate at least one employee to coordinate and comply with Title IX responsibilities, and recommended schools provide **training and education** to employees and students on sexual harassment and violence.[1]

128.

On April 24, 2013, OCR sent *Dear Colleague Letter: Retaliation*, to all U.S. public schools, including TCSD, reminding them they may not retaliate against students or parents who complain to a school about a civil rights violation like sexual discrimination.

129.

On April 24, 2015, OCR sent *Dear Colleague Letter: Title IX Coordinators*, and issued a *Title IX Resource Guide*, to all U.S. public schools, including TCSD. OCR reminded schools of their obligation to designate at least one employee as a Title IX Coordinator who is responsible for coordinating the school's efforts to comply with and carry out the school's Title IX responsibilities, pursuant to 34 C.F.R. §106.8(a). OCR stated, "In our enforcement work, OCR has found that some of the most egregious and harmful Title IX violations occur when a recipient fails to designate a Title IX coordinator or when a Title IX coordinator has not been sufficiently trained or given the appropriate level of authority to oversee the recipient's compliance with Title IX."

---

[1] The U.S. Department of Education withdrew this Dear Colleague Letter on September 22, 2017. However, the statistics cited above have not changed, and the requirements set forth above have not been formally revised or otherwise superseded by the U.S. Department of Education.

130.

The *Dear Colleague Letter: Title IX Coordinators* reminded all public schools, including TCSD, of their obligation to make the role of its Title IX coordinator visible to the school community, including having the recipient's website reflect the complete and current information about the Title IX coordinator.

131.

A 2012 study entitled *Adolescent Dating Violence: A National Assessment of School Counselors' Perceptions and Practices* published in the journal *Pediatrics*, found that while teen dating violence is a significant public health problem and victims of teen dating violence were more likely to experience a myriad of adverse health outcomes in adulthood, schools overwhelmingly fail to provide adequate training for responding to teen dating violence and do not find teen dating violence a high-priority issue.

132.

According to a 2015 published study entitled *Teen Dating Violence (Physical and Sexual) Among US High School Students* authored by researchers of the Division of Violence Prevention at the Centers for Disease Control and Prevention, more than 1 in 5 high school women and 1 in 10 high school men in the U.S. have experienced some form of teen dating violence in the past year.

133.

Advocacy groups such as *Break the Cycle* report that the effects of teen dating violence include victims earning significantly lower grades in school, victims suffering higher rates of sexually transmitted disease, higher rates of poor mental health, increased suicidal thoughts and attempted suicide.

134.

In June of 2019, a female student member of JHHS's very own Speech and Debate Team addressed the topic of high school rape culture while participating in the National Speech and Debate Association's National Tournament.

135.

TCSD was on notice that sexual harassment was a specific and recent problem with its own JHHS students. Specifically, in 2018, the Jackson Buckrail, a local newspaper, published an article entitled *Check Yes or No Consent*, written by former JHHS student Sarah Ross. A copy of this article is attached as Exhibit C. In the article, Ms. Ross describes an ongoing rape culture that is prevalent at JHHS. She also offers ideas as to possible causes and solutions. The article states that the Ms. Ross interviewed former JHHS students who attended from 2005 to 2018, as well as local community health professionals. The students relayed their personal experiences with student-against-student sexual assault and harassment at JHHS. Ms. Ross concluded that traumatic sexual experiences are extremely common with JHHS students. Specifically, both young men and young women at JHHS experienced violations, though women were much more likely to describe them as traumatic. The issue at JHHS is systemic, and the culture, predatory. Consent is not a value. Coercion is the baseline. These victims felt voiceless, powerless, and trapped in the tight-knit small-town high school. Multiple victims stated they did not understand consent or that they had been sexually assaulted until after leaving JHHS and learning that the JHHS student behavior is not normal. Ms. Ross concluded that "If adults do not acknowledge the darker side of Jackson's culture, that makes it difficult for young people to talk about it." On information and belief, TCSD, CHAPMAN, CRISP, ABRAHAM, and other administrators of TCSD and JHHS in particular were aware of this article and were familiar with the incidents described in the article.

136.

Upon information and belief, despite clear notice by the U.S. Supreme Court and OCR regarding Defendant TCSD's obligations to prevent and remediate the effects of sexual harassment, at all times relevant hereto TCSD, CHAPMAN, CRISP, and ABRAHAM failed to provide training or education to administrators, staff, students, and parents regarding Title IX, student-against-student sexual harassment, or retaliation against students who report sexual harassment.

137.

Upon information and belief, at all times relevant hereto, TCSD, CHAPMAN, CRISP, and ABRAHAM failed to provide training or education to administrators, staff, students, and parents on protecting students from sexual harassment and violence, interviewing victims and potential witnesses of sexual harassment, investigating reports of sexual harassment, remediating sexual harassment and violence, proper reporting of suspected sexual harassment or violence to TCSD employees, and prohibition on retaliating against students who report sexual harassment.

138.

Defendants' lack of training is evidenced, *inter alia,* by: its employees and administrators failing to comply with TCSD's own written policies regarding the investigation and handling of student-against-student sexual harassment; its employees and administrators admitted lack of knowledge about Title IX or who handles Title IX for TCSD; TCSD taking retaliatory action against Plaintiff including removing her from her classes, forcing her to sign a no-contact order, restricting her access to certain JHHS common areas; administrators permitting and supporting J.H. and his friends in their harassment and retaliation campaign with the end goal of trying to get Plaintiff kicked out of school; TCSD removing Plaintiff from the district under the pretext of

official policy compliance; TCSD administrators blaming Plaintiff for reporting that she had been raped by J.H; ignoring standards regarding how victims may delay for long periods of time or never report at all; failing to inform Plaintiff or her family about her Title IX rights and act appropriately regarding such rights; and failing to have or provide adequate, or any, information on students' Title IX rights.

139.

Upon information and believe, at the time Plaintiff sought to report to TCSD and JHHS that she had been raped by another TCSD student, TCSD had not designated an employee to coordinate its efforts to comply with and carry out its responsibilities under Title IX for the protection of its students' rights, including Plaintiff.

140.

TCSD did not appoint a Title IX Coordinator (Charlotte Reynolds) until eight months after TCSD obtained knowledge that Plaintiff had been raped by another TCSD student and after it began its campaign to remove Plaintiff from the district.

141.

Upon information and belief, at all times relevant hereto, TCSD had no Title IX coordinator or other employees at TCSD or JHHS designated to handle complaints of sexual harassment who were adequately trained in receiving, coordinating or investigating reports of sexual harassment and discrimination against students.

142.

During the 2017-2018, 2018-2019 and 2019-2020 school years, TCSD, CHAPMAN, CRISP, and ABRAHAM failed to adequately provide and make available to its students, including Plaintiff, the name and contact information for its Title IX Coordinator in the event a student, such

as Plaintiff, had been sexually assaulted by another student or was otherwise subjected to a hostile educational environment at JHHS and needed assistance.

143.

At all times relevant hereto, Defendant TCSD, CHAPMAN, CRISP, and ABRAHAM officially adopted sexual harassment policies, practices, and customs that were inequitable and inadequate with respect to investigating and properly responding to reports of student-against-student sexual harassment, and, in any event, based upon information and belief, Defendants failed to provide training or education on those policies to administrators, staff, students, and parents.

144.

Due to Defendants' failure to adequately train their administrators, staff, students, and parents to know how to report and handle reports of sexual harassment, perform investigations, and take reasonable remedial action to protect its students' Constitutional rights under Title IX and other federal and state laws, including Plaintiff, the hostile educational environment Plaintiff suffered after reporting her rape was escalated.

145.

Because of TCSD's failure to train as described herein, JHHS was not safe for Plaintiff and she was denied equal access to educational opportunities.

146.

Additionally, as a direct result of the Defendants' conduct described herein, Plaintiff has suffered and will continue to suffer great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, and psychological injuries. Plaintiff was prevented and will continue to be prevented from performing her normal daily activities and obtaining the full enjoyment of life;

and has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### POST-REPORT DELIBERATE INDIFFERENCE IN VIOLATION OF TITLE IX, 20 U.S.C. § 1681, *ET SEQ.*

147.

All paragraphs of this Complaint are incorporated herein by reference.

148.

TCSD, created and/or subjected Plaintiff to a hostile educational environment in violation of Title IX, because:

a. Plaintiff was a member of a protected class and suffered harassment so severe as to deprive her of access to educational opportunities;

b. TCSD had actual knowledge;

c. TCSD was deliberately indifferent to the harassment.

149.

Plaintiff is a member of a federally protected class, namely a female.

150.

J.H.'s student-against-student rape on Plaintiff, by itself, was sufficiently severe to create a hostile educational environment at JHHS.

151.

The ongoing sexual harassment and retaliation by J.H., his friends, and other students, related to J.H.'s original rape of Plaintiff and her report of the rape to JHHS administrators, also caused Plaintiff to suffer an increased hostile educational environment at JHHS.

152.

CRISP, ABRAHAM, Dean Tenney, and Emily Hoffer are each appropriate persons or officials of TCSD who at a minimum have authority to address alleged student discrimination and institute corrective measures on TCSD's behalf.

153.

TCSD, obtained actual knowledge when each CRISP, ABRAHAM, TENNEY, and Emily Hoffer, learned that Plaintiff reported having been sexually assaulted by J.H.

154.

TCSD, had actual knowledge when each CRISP, ABRAHAM, TENNEY, and Emily Hoffer were informed that Plaintiff was suffering ongoing sexual harassment and retaliation by J.H., his friends, and other students as a result of J.H.'s original rape of Plaintiff and her report of the rape to JHHS administration.

155.

TCSD, acting through CRISP, ABRAHAM, TENNEY, and Emily Hoffer, was deliberately indifferent to acts of student-against-student harassment when it failed to investigate Plaintiff's reported sexual assault and ongoing reports of sexual harassment and retaliation tied to her reporting of the sexual harassment.

156.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it failed to document any Title IX investigation or equivalent and failed to keep Plaintiff apprised of its investigation.

156.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it failed to take immediate effective remedial steps to resolve Plaintiff's report that she was sexually assaulted by another TCSD student.

157.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it failed to appropriately discipline Plaintiff's attacker, J.H., and his friends and other students, and take steps to prevent future student harassment on Plaintiff.

158.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it insisted to Plaintiff, through CRISP, ABRAHAM, TENNEY, and Emily Hoffer, that it had done all it was required to do to protect her from sexual harassment at JHHS.

159.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it took sides with J.H. and his friends and blamed Plaintiff for causing the issues surrounding her report of being raped by J.H., and then took punitive action against her including removing her from her most favored courses, requiring her to sign a no-contact order, restricting her access to parts of the school.

160.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it allowed Plaintiff's attacker and his friends to harass Plaintiff with ongoing false accusations of misconduct at JHHS and took remedial action against her for the false reports.

161.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when its inaction foreseeably caused Plaintiff's attacker and his friend to become emboldened and increase their harassment and retaliation against her.

162.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it failed to staff an adequately trained Title IX Coordinator, or equivalent, and in doing so jeopardized its students' safety and Constitutional rights, to include Plaintiff.

163.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it failed to adequately train its staff and administrators on how to handle and respond to reports of student on student sexual assault and harassment or provide training on Title IX procedures.

164.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when TCSD persisted in its clearly unreasonable action and inaction in response to the ongoing student sexual harassment and retaliation Plaintiff was suffering when it had actual knowledge that Plaintiff was suffering as a result of the hostile educational environment and failed to respond.

165.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it punished Plaintiff for reporting being raped by another JHHS student and ultimately orchestrated a plan to single Plaintiff out and force her to leave TCSD on the pretext of living out

of its district boundaries -an alleged policy violation that TCSD overlooked for many other students living in Alpine, Wyoming.

166.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it engaged in a policy, pattern and practice of behavior designed to discourage and dissuade students who have been sexually assaulted from seeking prosecution and protection, and from pursuing completion of their degrees and involvement in on-campus activity after being sexually assaulted, including Plaintiff.

167.

TCSD was deliberately indifferent to acts of student-against-student sexual harassment when it applied its policies, practices and customs in a manner that disparately treated and impacted its female students, including Plaintiff.

168.

TCSD's conduct described above in response to the allegations of rape and ongoing sexual harassment and retaliation of Plaintiff described herein was clearly unreasonable in light of the known circumstances.

169.

TCSD's conduct in response to learning that Plaintiff had been raped and suffered ongoing harassment and retaliation was clearly unreasonable in light of TCSD's obligations under existing Title IX legal precedent and regulations.

170.

TCSD's conduct resulted in Plaintiff, on the basis of her sex, being excluded from participation in, being denied benefits of, and being subjected to discrimination in TCSD's education programs in violation of Title IX.

171.

TCSD's failure to protect Plaintiff as described above was so severe, pervasive, and objectively offensive that it deprived Plaintiff of access to educational opportunities and/or benefits provided by TCSD.

172.

Additionally, TCSD, acting through CRISP, ABRAHAM, TENNEY, and Emily Hoffer had actual knowledge of the harm and suffering it caused Plaintiff by its institutional betrayal, including failure to investigate and adequately respond to Plaintiff's reports of student sexual harassment and retaliation, yet they still failed to take appropriate remedial action or steps to ensure that Plaintiff felt safe at JHHS.

173.

As a direct and proximate result of the TCSD's conduct described herein, TCSD created and/or subjected Plaintiff to a hostile educational environment that deprived her of access to educational opportunities at JHHS.

174.

As a direct and proximate result of TCSD's deliberate indifference to Plaintiff's rights to access to educational opportunities under Title IX, Plaintiff has suffered sexual harassment and retaliation and was made liable and vulnerable to ongoing student harassment and administrator harassment at JHHS.

175.

As a direct and proximate result of Defendant's deliberate indifference to Plaintiff's reports of sexual assault and ongoing harassment and retaliation, Plaintiff sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

    a.    Past, present, and future physical and psychological pain, suffering and impairment;

    b.    Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

    c.    A marred educational and disciplinary record, and impaired educational capacity and future earning capacity;

    d.    Attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; and

    e.    Such other and further relief as this Court deems just and proper.

## SECOND CAUSE OF ACTION

### RETALIATION IN VIOLATION OF TITLE IX, 20 U.S.C. § 1681, *ET SEQ.*

176.

All paragraphs of this Complaint are incorporated herein by reference.

177.

Reporting sexual assault and harassment to school officials is a statutorily protected activity under Title IX. Reporting incidents of sex discrimination is integral to Title IX enforcement.

178.

Because Plaintiff reported J.H.'s sexual harassment and assault to TCSD, Defendant TCSD's administrators, employees, and agents retaliated against her by, among other things, removing her from her classes, restricting her access to public areas of JHHS, insisting that she sign a no contact order, ultimately implementing a plan to remove Plaintiff from JHHS, and refusing to provide her with meaningful accommodations.

179.

Defendant, through its agents, acted materially adversely to Plaintiff in that it negatively impacted her educational record, deprived her of educational opportunities and benefits, and subjected her to a hostile education environment.

180.

As a direct and proximate result of Defendant's retaliation, Plaintiff sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

b.    Past, present, and future physical and psychological pain, suffering and impairment;

f.    Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

g.    A marred educational and disciplinary record, and impaired educational capacity and future earning capacity;

h.    Attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; and

i.    Such other and further relief as this Court deems just and proper.

## THIRD CAUSE OF ACTION

### DISPARATE TREATMENT & IMPACT, IN VIOLATION OF PLAINTIFF'S CONSTITUTIONAL AND FEDERAL RIGHTS, PURSUANT TO 42 U.S.C. § 1983

181.

All paragraphs of this Complaint are incorporated herein by reference.

182.

Sexual harassment is a form of unlawful sex discrimination that can violate the Equal Protection Clause of the 14th Amendment to the U.S. Constitution. Plaintiff's Equal Protection rights were violated when she suffered sexual harassment and discrimination at JHHS.

183.

Plaintiff had federal civil rights secured by federal statute, Title IX of the Education Amendments of 1972, which provides in pertinent part:

> [N]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

184.

Title IX was intended to benefit students like Plaintiff.

185.

Title IX provides students like Plaintiff clear civil rights, which are not amorphous or vague, to be free from known sex discrimination at school.

186.

Title IX imposes a binding mandatory obligation on federal funding recipients like Defendant, prohibiting it from discriminating against students on the basis of sex.

47

187.

The U.S. Supreme Court, in *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 255-58

(2009), stated, "we conclude that Title IX was not meant to be an exclusive mechanism for

addressing gender discrimination in schools," and held a plaintiff may bring causes of action under

*both* Title IX *and* § 1983 for unlawful sex discrimination. Accordingly, a remedy for sex

discrimination in schools is not foreclosed under §1983.

188.

Title 42 U.S.C. § 1983 provides that

Every person who, under color of any statute, ordinance, regulation, custom, or
usage, of any State or Territory or the District of Columbia, subjects, or causes to
be subjected, any citizen of the United States or other person within the
jurisdiction thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party injured in an
action at law, suit in equity, or other proper proceeding for redress, except that in
any action brought against a judicial officer for an act or omission taken in such
officer's judicial capacity, injunctive relief shall not be granted unless a
declaratory decree was violated or declaratory relief was unavailable.
. . .

183.

At all times relevant hereto, Defendants TCSD, CHAPMAN, CRISP & ABRAHAM

were policy makers and administrators having duties to create and implement policies, and failed

to properly or sufficiently train its administrators, staff, students, and parents about: sex

discrimination and sexual harassment against students; Title IX and/or student-against-student

sexual misconduct; identifying, investigating, reporting, and remedying the effects of sexual

harassment by students like J.H. against students like Plaintiff; or, properly responding to and

remediating continued harassment and hostility by students like those who continued to harass

Plaintiff after she reported sexual assault.

184.

Defendants' systematic and purposeful creation of customs, policies, and procedures resulted in the deprivation of the liberty and bodily integrity of its students, including Plaintiff, and clearly violates the Fourteenth Amendment to the United States Constitution. Specifically, Defendants deliberately adopted inadequate customs, procedures, and practices in violation of Plaintiff's equal protection and substantive due process rights under color of State Law.

185.

Defendants' systematic and purposeful implementation of its customs, policies, and procedures resulted in the deprivation of the liberty and bodily integrity of its students, including Plaintiff, and clearly violates the Fourteenth Amendment to the United States Constitution. Specifically, Defendants deliberately adopted inadequate customs, procedures, and practices in violation of Plaintiff's equal protection and substantive due process rights under color of State Law.

186.

While TCSD maintains official policies regarding discrimination, student harassment, the reporting and prompt investigation of discrimination and sexual harassment complaints, and disciplinary action, Defendants' informal policies, patterns and/or practices of behavior constituted disparate treatment of victims of sexual assault and harassment, and had a disparate impact on victims of sexual assault and harassment, to include Plaintiff.

187.

Defendants maintained a practice of being ambivalent to and/or ignoring reports of student-against-student sexual harassment and taking sides with those accused of sexual assault and

harassment, including Plaintiff's reports, and refused to acknowledge that student-against-student sexual harassment was a problem at its JHHS, despite public reports that an ongoing culture of student rape and harassment existed in its high school community.

188.

Consistent with its practices, Defendants failed to investigate and take reasonable remedial action to reports of J.H., a TCSD student, sexually assaulting Plaintiff, another TCSD student.

189.

Consistent with its practices, Defendants failed to investigate and take reasonable remedial action to reports that J.H. and other JHHS students were sexually harassing Plaintiff as a result of the aforementioned sexual assault and retaliating against her because she reported the assault and harassment to authorities and JHHS administration and staff.

190.

Each time Plaintiff was accused of misconduct, Defendants promptly took remedial action, without affording Plaintiff adequate due process.  Most accusations against Plaintiff were false reports that Plaintiff was harassing or threatening J.H. and his friends.

191.

Defendants engaged in a policy, pattern and practice of behavior designed to discourage and dissuade female students who have been sexually assaulted from seeking prosecution and protection, and from pursuing completion of their degrees and involvement in on-campus activity after being sexually assaulted.

192.

The policy, patterns, practices, and actions of Defendants constituted disparate treatment of female students, female sexual assault victims, had a disparate impact on female students, and amounts to behavior that shocks the conscience.

193.

As a direct and proximate result of Defendants' deliberate indifference to Plaintiff's equal protection and substantive due process rights under the Fourteenth Amendment of the United States Constitution, Plaintiff sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

c.  Past, present, and future physical and psychological pain, suffering and impairment;

j.  Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

k.  A marred educational and disciplinary record, and impaired educational capacity and future earning capacity;

l.  Attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; and

m.  Such other and further relief as this Court deems just and proper.

**FOURTH CAUSE OF ACTION**

**FAILURE TO TRAIN, IN VIOLATION OF PLAINTIFF'S CONSTITUTIONAL AND FEDERAL RIGHTS, PURSUANT TO 42 U.S.C. § 1983**

194.

All paragraphs of this Complaint are incorporated herein by reference.

195.

At all times relevant hereto, Defendants TCSD and CHAPMAN were policy makers and administrators having duties to train, and failed to properly or sufficiently train its administrators, staff, students, and parents about: sex discrimination and sexual harassment against students; Title IX and/or student-against-student sexual misconduct; identifying, investigating, reporting, and remedying the effects of sexual harassment by students like J.H. against students like Plaintiff; or, properly responding to and remediating continued harassment and hostility by students like those who continued to harass Plaintiff after she reported sexual assault.

196.

At all times relevant hereto, Defendants TCSD and CHAPMAN were policy makers and administrators having duties to train, and failed to properly or sufficiently train, administrators, staff, students, and parents about: school policies concerning sex discrimination and sexual harassment against students; Title IX and/or student- against-student sexual misconduct; identifying, investigating, reporting, and stopping sexual harassment by students like J.H. against students like Plaintiff; or, properly responding to and remediating continuing harassment and hostility by students like those who continued to harass Plaintiff after she reported sexual assault.

197.

Defendants TCSD and CHAPMAN failed to train their administrators, staff, students and parents despite the plainly obvious need for training on, among other things, student-against-student sexual misconduct and identifying, investigating, reporting, stopping, and remediating the effects of sexual harassment.

198.

Defendants TCSD and CHAPMAN failed to train their administrators, staff, students and parents despite the plainly obvious need for training on, among other things, the prohibition, illegality, and impropriety of retaliating against students like Plaintiff who report violations of Title IX and student-against-student sexual misconduct, which is vital to enforcement of Title IX.

199.

Numerous authorities, including the U.S. Supreme Court and U.S. Department of Education, made clear and gave notice to Defendants that school employees will confront student sexual harassment and abuse with regularity, given the high predictability, recurrence and prevalence of student-against-student sexual assault and abuse in schools. Thus, it was foreseen and inevitable that Defendant's administrators and employees would encounter recurrent situations involving sexual abuse that implicated students' Constitutional and federal rights, and it did, in fact, encounter those recurring situations.

200.

Defendants TCSD and CHAPMAN failed to adequately train their administrators, staff, students, and parents, and thereby prohibit or discourage foreseen conduct and retaliation, despite the clearly established and well-known known dangers of sexual harassment, assault, battery, and violence faced by students in U.S. public schools, and thereby was deliberately indifferent.

201.

Defendant's failure to train its administrators, staff, students, and parents effectively denied Plaintiff clearly established federal rights and Constitutional rights.

202.

Defendants TCSD's and CHAPMAN's failure to train administrators, staff, students, and parents was deliberate, reckless, and in callous indifference to Plaintiff's federally protected rights.

203.

As a direct and proximate result of Defendants TCSD's and CHAPMAN's actions, inactions, and deliberate indifference to and violation of Plaintiff's clearly established Constitutional and federal rights, Plaintiff suffered, and continues to suffer, injuries including, without limitation, emotional distress, psychological trauma, and mortification.

204.

TCSD accepts hundreds of thousands of dollars of Federal educational funding each year and in turn promises to comply with the corresponding Title IX obligations. Yet, here, TCSD failed to meet its most basic obligations to appoint a Title IX coordinator, assign an investigator to investigate Plaintiff's complaints of sex assault and harassment, and perform its required Title IX investigation.

205.

Upon information and belief, TCSD BOARD recognized some of its failures under Title IX when it ultimately appointed a staff member to serve as its Title IX Coordinator position in the Fall of 2019. However, TCSD learned that Plaintiff was sexually assaulted by another TCSD student in January of 2019. By the time TCSD appointed a Title IX Coordinator, its duties to promptly perform a thorough investigation into Plaintiff's allegations of sexual assault and take prompt action to remedy its effects had been breached. As a result, Plaintiff was denied equal access to educational opportunities at JHHS.

206.

To this end, TCSD's and CHAPMAN's failure to train caused and perpetuated a culture of sexual harassment at JHHS that discouraged and dissuaded students who have been sexually assaulted and harassed from seeking prosecution and protection, and from pursuing completion of their degrees and involvement in on-campus activity after being sexually assaulted, including Plaintiff.  When victims, such as Plaintiff, finally found courage to speak up about their student assailants, TCSD staff and administrators were ignorant about victims' rights, and caused victims to become targets of harassment, victim blaming and other retaliation, either at the hand of TCSD staff or by those emboldened by TCSD's actions and inaction, or both.

207.

As a direct and proximate result of Defendants TCSD's and CHAPMAN's failure to train, Plaintiff sustained and continues to sustain injuries for which she is entitled to be compensated, including but not limited to:

d.    Past, present, and future physical and psychological pain, suffering and impairment;

n.    Medical bills, counseling, and other costs and expenses for past and future medical and psychological care;

o.    A marred educational and disciplinary record, and impaired educational capacity and future earning capacity;

p.    Attorneys' fees and costs, pursuant to 42 U.S.C. § 1988; and

q.    Such other and further relief as this Court deems just and proper.

## PUNITIVE DAMAGES

### 208.

In addition to compensatory damages, Plaintiff makes a claim for punitive damages against Defendants in an amount to be proven at trial for the willful and wanton acts and omissions of Defendants, to include violation of her civil rights as alleged herein under 42 U.S.C. § 1983. The acts and omissions of Defendants in this case were so gross and culpable in nature that they constitute reckless indifference and wanton disregard for the law and for the safety of TCSD students, including Plaintiff. Defendants committed the acts and omissions alleged herein and subjected Plaintiff to improper treatment that caused Plaintiff to suffer harm so severe that no child should be expected to endure it. Defendants' actions should be punished, and an example should be made so that these actions and omissions are not repeated.

### 209.

This instance of reckless and callous indifference to Plaintiff's safety and Constitutional rights should be punished through the imposition of punitive damages so as to make an example of conduct that will not be tolerated.

## **ATTORNEY FEES**

### 210.

As a result of Defendants' actions as alleged herein, Plaintiff has been required to retain the services of attorneys and are entitled to a reasonable amount for attorney's fee pursuant to 42 U.S.C. § 1988 for those violations covered by the Civil Rights Act.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays the Court for judgment in favor of Plaintiff and against Defendants, awarding Plaintiff her compensatory damages in an amount to be established at trial, equitable relief amending Plaintiff's educational and disciplinary record, reasonable attorneys' fees and costs, legal interest and such other relief as the Court may deem just and proper under the circumstance.

## JURY DEMAND AND DESIGNATION OF PLACE OF TRIAL

Plaintiff requests that this matter be tried to a jury in Jackson, Wyoming.

JANE DOE, Plaintiff,

By: _____
Kaden B. Canfield, 7-6238
EDWARDS LAW OFFICE, P.C.
PO Box 5345
Etna, WY 83118
Ph: (307) 883-2222
Fax: (307) 883-0555
kaden@edwardslawofficepc.com

By: _____
Jack D. Edwards, 6-3877
EDWARDS LAW OFFICE, P.C.
PO Box 5345
Etna, WY 83118
Ph: (307) 883-2222
Fax: (307) 883-0555
jack@edwardslawofficepc.com